# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

| | |
|---|---|
| CHANDRA H. BREWTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 5:14-CV-436(MTT) |
| | ) |
| THE FIRST LIBERTY INSURANCE CORPORATION, | ) |
| | ) |
| Defendant. | ) |

## ORDER

This case is one of several putative class actions filed in this Court in which the plaintiffs, all of whom are represented by the same lawyers, allege that the insurance companies providing their homeowners coverage have denied that their policies provide coverage for the diminished value of property damaged as a result of a loss that is overwise covered by their policies. Basically, the Plaintiffs want their insurers to accept what has been clearly established by the Georgia Supreme Court—when the value of a home has decreased as the result of a covered loss even though the home has been fully repaired, the insurer must compensate the insured for that diminished value. *State Farm Mut. Auto. Ins. Co. v. Mabry*, 274 Ga. 498, 556 S.E.2d 114 (2001); *Royal Capital Dev. LLC v. Maryland Cas. Co.*, 291 Ga. 262, 728 S.E.2d 234 (2012). The Georgia Supreme Court has also held that when an insurer denies coverage for diminished value and has refused to assess a loss for diminished value, a court appropriately can order the insurer to assess for diminished value. *Mabry*, 274 Ga. at 509-10, 556 S.E.2d at 123-24. When the plaintiffs' lawyers filed this suit on behalf of Chandra Brewton, they thought The First Liberty Insurance Corporation was one of those insurers that

stubbornly refused to accept that its policy covered diminished value. Only long after filing suit did Brewton's lawyers discover they were wrong. For First Liberty, in response to the Georgia Supreme Court's rulings, had acknowledged that Brewton's policy covered diminished value and had assessed her loss to determine whether the value of her home had diminished notwithstanding the repairs paid for by First Liberty. Given that, the Court granted First Liberty's motion for summary judgment on Brewton's claim that First Liberty did not assess her loss for diminished value. Doc. 60.

Brewton has submitted further evidence and asked the Court to reconsider. Brewton asks this court to fashion a remedy that goes beyond the limited remedy created by the Georgia Supreme Court in *Mabry*. Even though First Liberty acknowledged her policy covered her loss, and even though it assessed her loss to see if the value of her home had diminished, she wants the Court to order First Liberty to do another assessment, what she calls a proper assessment. Doc. 69. Brewton has also moved to amend her complaint. Doc. 71. As discussed below, the Court **DECLINES to alter its previous order** granting summary judgment against Brewton's "failure to assess" claims (Doc. 60) and **DENIES** Brewton's motion to file a third amended complaint (Doc. 71).[1]

## I. MOTION FOR SUMMARY JUDGMENT

**A.  Procedural History and Previous Order**

In *State Farm Mut. Auto. Ins. Co. v. Mabry*, the Georgia Supreme Court held that insurers must assess and pay for diminished value absent an explicit policy provision

---

[1] Brewton also moved to strike the deposition errata sheet submitted by First Liberty's corporate designee, Charles Bradley Spinks. Doc. 70. But First Liberty withdrew that errata sheet. Doc. 72. Accordingly, the motion to strike (Doc. 70) is **MOOT**.

excluding such coverage. 274 Ga. 498, 556 S.E.2d 114 (2001). *Mabry* involved an automobile insurer, but in *Royal Capital Dev. LLC v. Maryland Cas. Co.*, the Georgia Supreme Court answered a question certified by the Eleventh Circuit and held that *Mabry* applies to real property insurance policies as well. 291 Ga. 262, 728 S.E.2d 234 (2012). So, like the other plaintiffs asserting these claims against their insurers, Brewton alleges in her "cookie cutter" complaint[2] that her homeowner's insurance policy covers diminished value and that First Liberty failed to assess her property to see whether its value had decreased, thereby breaching its contract with her. *See* Doc. 49 ¶¶ 28, 31, 42.

But First Liberty had recognized that the Georgia Supreme Court ruled that casualty policies cover diminished value in *Mabry* and *Royal Capital*, and it had begun assessing losses for diminished value. Specifically, First Liberty charged its adjusters with completing a four-step procedure to determine whether diminished value existed: (1) verify that *Royal Capital* applies to the claim by determining whether the claim was a first-party real property claim in Georgia, (2) decide whether diminished value could exist by looking for certain "unusual" circumstances in which diminished value "could apply" even with full repairs, (3) determine whether repairs returned the property to its pre-loss value, and (4) if no diminished value is found, communicate that decision to the insured and note the decision in the claim file. Docs. 51-1 at 3-4; 51-10 at 2-3. If, however, the adjuster determines that there is a possibility that repairs alone are insufficient to return the property to its pre-loss value, he or she is required to report the

---

[2] *See* Doc. 59 at 12-13, Transcript of April 25, 2017 Phone Conference at 12:24-13:1 (Court: "But tell me, is not your Complaint here just a cookie cutter of all your other complaints?" Counsel for Plaintiff: "The Complaint is the same, yes.").

possibility to First Liberty personnel specifically assigned to consider the possibility of diminished value. Docs. 51-6 at 8:3-4; 69-12 at 43:16-45:13, 53:2-10.

Thus, as the Court summed up in the previous order, "this was not a *Mabry/Royal Capital* case. It was just a simple, garden variety dispute over the value of a fully-covered claim." Doc. 60 at 13. Because First Liberty did not deny coverage for Brewton's diminished value claim and did not fail to assess for diminished value, the Court granted First Liberty's motion for summary judgment on her failure to assess claim. However, the Court noted Brewton's suggestion in her response to the motion for summary judgment that discovery had not yet closed and that "perhaps further discovery could yield evidence" that would make dismissal of her failure to assess claims inappropriate. *Id.* at 16 (citing Doc. 53 at 24). Given the collapse of the factual and legal grounds for her claims, that seemed unlikely. Nevertheless, the Court allowed Brewton to continue discovery on the issue and gave her the chance to supplement her response to the motion for summary judgment. Docs. 62; 65. Brewton has now done so. Doc. 69.

**B.    Summary Judgment Standard**

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When the *non[-]moving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim.'" *Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)). The moving party "simply may show . . . that there is an absence of evidence

to support the non[-]moving party's case." *Id.* at 1438 (internal quotation marks and citation omitted). "Assuming the moving party has met its burden, the non-movant must then show a genuine dispute regarding any issue for which it will bear the burden of proof at trial." *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224-25 (11th Cir. 2002) (citing *Celotex Corp.*, 477 U.S. at 324).

In determining whether a genuine dispute of material fact exists, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted). A material fact is any fact relevant or necessary to the outcome of the suit. *Id.* at 248. And a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party." *Id.*

### C. Brewton's Supplemental Response to First Liberty's Motion for Summary Judgment

In her supplemental response, Brewton argues that new evidence reveals that First Liberty's diminished value assessment of Brewton's home was a "sham assessment" that was not an assessment at all. *See generally* Doc. 69. In her motion, though, Brewton mostly highlights evidence the Court has already considered, including the adequacy of (1) training of the adjuster who assessed her home for diminished value, (2) steps that the adjuster took in assessing Brewton's home for diminished value, and (3) the standard operating procedure First Liberty had in place for adjusters to assess for diminished value. *See generally id.* Although the standard operating procedure directed assessors to consider diminished value—including whether "the perception of 'stigma'" could make the property "less desirable in the marketplace"—

Brewton contends that new evidence reveals these procedures were inadequate, to the point of being a "sham." Doc. 53-6; Doc. 69 at 16, 19-23.

This new evidence can be summarized as: (1) deposition testimony from First Liberty's adjusters, claims unit manager, and point person for diminished value that, Brewton argues, admit that First Liberty adjusters "merely looked for condition and not value," and (2) First Liberty's inability to demonstrate that it ever paid out, set aside funds to pay out, or changed software to allow it to internally record paying out any diminished value claims. *See* Doc. 69 at 22-24.

However, Brewton simply overstates the evidence when she contends that First Liberty's adjusters and head of the examining group "all admit that, in carrying out the SOP, adjusters merely looked at condition and not value." Doc. 69 at 22. She cites for that proposition her new statement of material facts, which in turn cites the depositions of Drexel Cook,[3] Charles Bradley Spinks, Robert Lee Brown, Jr., Richard Jonathan Benson, and Ricky Dale Summerlin. *Id.*; Doc. 69-3 ¶¶ 44, 46 (citing Docs. 53-14 at 145:16-146:8; 69-9 at 200:20-201:2, 254:3-9; 69-10 at "110:91-111:"; 69-11 at 53:13-54:6; 69-12 at 139:12-21). But, at the pertinent excerpt, Cook was asked under what circumstances "*other than the items that are listed in the standard operating procedure*" he could imagine the possibility of diminished value, and he answered that a contractor being unable to repair a home to its "preexisting conditions" or pre-loss "position" was the only other instance he could think of. He also testified that when he assessed Brewton's home, he considered "any type of issue with the value of the home," based on "the cause of loss and—and—and exactly what's going on, why we have this claim."

---

[3] Cook's deposition was already in the record the Court considered in tentatively granting summary judgment. Doc. 53-14.

- 6 -

Doc. 53-14 at 145:16-147:11, 157:2-23 (emphasis added). Brown, an adjuster who works in Georgia for First Liberty, testified that, to determine whether a home that had suffered fire damage (not Brewton's) could have suffered diminished value, he considered "the repairs that are needed and what the final result is going to be after the repairs are completed" in determining the ultimate change in "value" to the home, as directed by the documents provided by First Liberty, such as the standard operating procedure and frequently asked questions. Doc. 69-10 at 10:24-11:12, 63:8-14, 110:19-111:12. Later in the deposition, Brown was asked whether, in determining that the fire-damaged home could not have suffered diminished value, he had considered "whether the market value of the home would be affected by the perceptions of any potential buyers upon learning that more than 50 percent of the home was affected by a fire;" he answered, "[t]hat was taken into consideration, yes," and that was what he meant when he testified earlier that he "basically looked at the whole picture" in determining whether the home could have suffered diminished value. *Id.* at 140:1-24. Benson, a project manager who works for First Liberty on technology projects after having served as a claims adjuster (though, like Brown, he was not Brewton's adjuster), testified multiple times that he could not remember what factors he considered in assessing diminished value when he was a claims adjuster. Doc. 69-11 at 23:15-24:20, 49:22-52:23. Finally, Benson answered, "I think the main factor is whether or not the home is put back in pre-loss condition," before reiterating multiple more times that he could not recall other factors. *Id.* 53:13-54:20. That tentative statement, made by a former adjuster who claimed many times to not recall how to assess for diminished value, certainly does not constitute an admission "that, in carrying out the SOP, adjusters merely looked at

condition and not value." Doc. 69 at 22. Nor do the statements from the other adjusters.

Brewton similarly mischaracterizes the deposition testimony of First Liberty higher-ups. At his deposition, Spinks, a claims unit manager for First Liberty's General Adjusters Complex Team and First Liberty's corporate designee, was asked to confirm that First Liberty adjusters are "not trained to determine premarket value" and are trained "to determine whether the property has been brought back to its pre-loss condition," and he responded, "[t]hat is correct" to both. Doc. 69-9 at 8:22-9:2, 200:20-201:2, 254:3-9. But that followed a series of questions in which Spinks testified that adjusters should, in consultation with their managers, pass certain claims with the possibility of diminished value up to the examining group, as highlighted in the standard operating procedure. *Id.* at 196:12-16, 198:17-200:19. Elsewhere, when asked how First Liberty assessed for diminished value, Spinks testified that "you have to take each and every one on its own merit and evaluate it accordingly," and to do that requires, "[a]s we've laid out in our standard operating procedure, bringing it back to pre-loss value, determining whether the property has been stigmatized." *Id.* at 253:4-20. Finally, at the pertinent part of his deposition, Summerlin, a First Liberty technical claims consultant who served as the point person for developing First Liberty's diminished value assessments and reviewed claims presented to him by adjusters and managers, was asked this question: "Before the adjuster makes the decision of either 'Yes' or 'No,' what is he or she, under [the standard operating procedure], supposed to consider?" Doc. 69-12 at 25:1-4, 139:12-14. Summerlin answered, "Looking at all the facts related to the loss itself, the type of—and—and quantity of repairs that are necessary to restore

the structure or building to its original condition." *Id.* at 139:15-21. A few moments later in his deposition, Summerlin makes clear that it is his opinion that "*[g]enerally*" stigma does not exist in a home that has been returned to its pre-loss condition because "the *perception*, at least in general, is that the property has been improved." *Id.* at 143:23-144:5 (emphases added). Summerlin continued that there could be stigma when a loss "would not be related to the actual physical damage. It would just be a psychological perception" associated with the loss. *Id.* at 144:20-145:7. It is therefore not true that, as Brewton contends, "the reality is that adjusters considered only the 'condition' of the property when determining whether" diminished value could exist. Doc. 69 at 22.

Brewton also argues that the fact that First Liberty did not pay out, set aside funds to pay out, or change software to allow it to internally record paying out any diminished value claims demonstrates that the standard operating procedure was a "sham." Doc. 69 at 20-22. Brewton argues that "a procedure that does not result a [sic] 'single [property] having any diminished value' is not credible under *Mabry*." *Id.* at 23. But that quote and determination come from the *Mabry* state *trial* court, in an order which was not taken up by the Georgia Supreme Court and evaluated the defendant automobile insurer's compliance with another court order, and the term "[property]" was, in the *Mabry* trial court's order, "vehicle." Doc. 69-23 at 2, 6. The state trial court noted the inconsistency between the defendant's assertion that no vehicles had suffered diminished value and the *defendant*'s expert's testimony that "diminished value will occur in 'most' *vehicles* after repairs have been completed following a loss," especially in light of the defendant's complete lack of a "standard or uniform measure or guide employed" for assessing for diminished value. *Id.* at 6-7 (emphasis added).

- 9 -

But vehicles experience stigma—and, accordingly, diminished value—at a much higher rate than do pieces of real property. As the Court noted in its prior order,

> Typically, the repair of a wrecked car fixes it. But there is a common perception that a wrecked car loses value notwithstanding complete repairs. Thus, when a CARFAX report, for example, reveals that a car has been damaged in an accident, the value of the car in the eye of a potential purchaser decreases even though the car has been repaired.

Doc. 60 at 2-3. In contrast, in *Royal Capital*, the Georgia Supreme Court noted that it is "unusual" for diminished value to exist in real property notwithstanding full repairs. 291 Ga. at 265, 728 S.E.2d at 236-37 (quoting *John Thurmond & Assocs. v. Kennedy*, 284 Ga. 469, 471 n.2, 668 S.E.2d 666, 669 n.2 (2008)). Accordingly, the absence of any paid diminished value claims does not, in itself, create a factual issue as to whether First Liberty's assessment procedure was a "sham."[4]

And Summerlin's uncontroverted testimony demonstrates a real effort to adhere to *Mabry* and *Royal Capital*. After *Royal Capital* was decided, Summerlin headed a "team to develop standard operating procedures related to how we would handle the diminution in value issue, and also training materials, and also be a part of the actual delivery of some of the training." Doc. 69-12 at 38:25-39:7. The team met for "probably an average of two meetings . . . per week" for a period of months to develop those materials. *Id.* at 42:8-11. First Liberty distributed the standard operating procedure to adjusters, and it also distributed a "Frequently Asked Questions" and a PowerPoint presentation that adjusters and managers could access as further guidance and

---

[4] Significantly, though, the Georgia Supreme Court in *Mabry* never considered the question of whether diminished value actually existed in a particular automobile claim. Faced with the daunting challenge of assessing thousands of claims that were filed during the applicable statute of limitations and, no doubt, because of its admission that diminished value was common in the automobile context, State Farm settled, agreeing to pay diminished value, presumably on every loss, pursuant to a uniform formula. *See generally* Frank E. Jenkins III & Wallace Miller III, *Georgia Automobile Insurance Law* § 25:2 (2017-2018 Edition).

support.  *Id.* at 66:11-20.  After the standard operating procedure was developed, Summerlin spent "probably a couple of hours a week fielding questions" and helping train adjusters.  *Id.* at 42:17-24.  In his role reviewing claims passed along to him by adjusters and managers, Summerlin discussed or examined the possible diminished value of "maybe a dozen or two" specific claims.  *Id.* at 43:16-45:13, 53:2-10.  He testified that (1) he did not ever find diminished value in any of the cases that he reviewed for diminished value based on the types of loss of those cases, and (2) he was not surprised by that outcome because, as the Georgia Supreme Court observed in *Royal Capital*, diminished value would be unusual in real property cases, in which full repair usually is sufficient to eliminate any loss due to stigma.  *Id.* at 142:18-143:16.

Brewton argues that "a *Mabry*-compliant assessment" must include "an appropriate methodology based on standards and criteria to calculate diminished value."  Doc. 69 at 19.  But that requirement was imposed by the *Mabry* state trial court in an order considering the defendant automobile insurer's compliance with the court's previous injunction.  *See generally* Doc. 69-23; *see also* Doc. 69 at 19-20 (Brewton's supplemental response, citing to *Mabry* trial court orders).  The *Mabry* decision that binds this Court, as well as the one that through *Royal Capital* also applies to real property claims, held that (1) diminished value can exist on insured properties notwithstanding full repair, (2) insurers must pay for diminished value if repairs do not return a property to its pre-loss value, (3) insurers are "obligated to assess that element of loss along with the elements of physical damage when a policyholder makes a general claim of loss," and (4) it was not error for the *Mabry* trial court to order the defendant automobile insurer to develop an appropriate methodology for assessing for

diminished value and to report to the trial court the manner in which it was complying with that requirement.  *Mabry*, 274 Ga. at 509-10, 556 S.E.2d at 123-24.  There is not, in short, a "*Mabry*-compliant assessment" which all insurers must use.  Doc. 69 at 19.

But the fundamental problem with Brewton's effort to salvage her failure to assess claim by creating a factual issue is that there is no legal basis for her claim.  The "failure to assess" claim recognized in *Mabry*, and the resulting order to assess to remedy that failure, arose in a situation in which an insurer denied its policy covered diminished value and thus refused to assess for diminished value.  Here, the undisputed facts are that First Liberty admitted Brewton's policy covers diminished value, it established a standard operating procedure to assess for diminish value, and Brewton's adjuster assessed her home for diminished value.  The adjuster testified that he concluded that there was not a possibility for diminished value at Brewton's home because, based on his two inspections of the home, there was "[n]othing that out of the ordinary" as to the "type of loss" that would cause him to alert his superiors that he felt there could be diminished value.  Doc. 53-14 at 129:22-130:2, 160:2-17, 163:3-25.  The adjuster further testified that he has sent a matter up for further examination of diminished value, but that, in contrast to that case, he did not think Brewton's home had the potential for stigma.  *Id.* at 129:22-130:9, 140:10-16, 160:2-161:17.

Thus, in the end, Brewton contests the adequacy of the assessment she received for a covered loss, not the denial of coverage and the total failure to assess.  Simply put, she asserts a claim not sanctioned by *Mabry*, and the Court sees no reason to expand *Mabry* to create such a claim.  Nothing has changed since the Court's previous assessment of this case:

> Brewton's claim is not a *Mabry*/*Royal Capital* claim. Nothing in Georgia law supports Brewton's new and un-pleaded theory that an insured can bring a stand-alone claim for the failure to *properly* assess a covered loss. Again, insureds have long had a remedy when they think their insurer has undervalued their claims—they file a lawsuit claiming that they should get more than what their insurers want to pay. *Mabry* afforded an insured another remedy in a very narrow situation. When an insurer improperly denies coverage for diminished value and thus refuses to assess for diminished value, the insured may be entitled to an equitable remedy, *i.e.*, an order directing the insurer to assess for diminished value. *Mabry* did not give the "insured the right to insist on any particular claims handling procedure," but rather "merely required that [insurers] handle all elements of loss in each claim" by "develop[ing] an appropriate methodology for making such evaluations." *Mabry*, 274 Ga. at 509-10, 556 S.E.2d at 123-24.

Doc. 60 at 15-16.[5]

## II. MOTION TO AMEND COMPLAINT

Brewton also moves to amend her complaint pursuant to Federal Rule of Civil Procedure 15(a)(2). Doc. 71. Brewton "seeks leave to amend to add allegations related to, and claims arising from, [First Liberty]'s scheme that was created and implemented to give the appearance that [First Liberty] was complying with its duty under Georgia law and its insurance policies to assess for and pay diminished value when, in reality, [First Liberty] never intended to do so." Doc. 71-1 at 1. Specifically, Brewton wishes to add claims for violations of the Georgia Racketeer Influenced and Corrupt Organizations (RICO) Act based on First Liberty's theft by taking and theft by deception of Brewton and other insureds' contract rights and services. *Id.* at 1; Doc. 71-

---

[5] In a single paragraph at the end of her 30-page supplemental response, citing only a single general treatise for legal authority, Brewton "requests, in the alternative, to substitute plaintiffs" for the "failure to assess" claims. Doc. 69 at 28. She argues that First Liberty's standard operating procedure was not in place when some insureds' losses occurred and, therefore, even if the standard operating procedure is valid as to Brewton, other insureds' homes were not assessed pursuant to the standard operating procedure. *Id.* The Court does not have sufficient legal or evidentiary grounds to grant such a request attached to a supplemental response to a motion for summary judgment.

- 13 -

2 at ¶¶ 136-37, 141-43, 157-60. As discussed below, the motion is denied because of the futility of the added claims and, in the alternative, the late stage at which Brewton seeks to amend when she should have known facts underlying her requested new claims much earlier.

**A.    Motion to Amend Standard**

Leave to amend should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). The Court "need not, however, allow an amendment (1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) where allowing amendment would cause undue prejudice to the opposing party; or (3) where amendment would be futile." *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "[D]enial of leave to amend is justified by futility when the complaint as amended is still subject to dismissal." *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1263 (11th Cir. 2004) (internal quotation marks and citation omitted).

**B.    Futility**

Brewton has been afforded the chance to conduct discovery, and, as discussed above, the Court finds as a matter of law that Brewton cannot show that First Liberty conducted a "sham" assessment for diminished value that was not an assessment at all. The same reasons for that finding require the finding that Brewton's Georgia RICO claims fail as a matter of law.

Brewton argues that First Liberty "created and implemented a scheme that would ensure the end result would be no payment of any diminished value." Doc. 71-1 at 5. Brewton's requested amendments allege that First Liberty thus, through its "sham

procedure," engaged in the racketeering activity of theft of its insureds' contract rights, services, premiums, and "money as payment for diminution in value losses the insureds had incurred," by taking for itself money that should have gone to assessing and paying insureds' diminished value. Doc. 71-2 ¶¶ 142-44. The requested amendments allege that First Liberty engaged in the predicate act of theft by taking when it "took premiums from [its insureds] with the intent of depriving the insureds with the coverage for which they were paying," and that First Liberty engaged in the predicate act of theft by deception when it promised performance of services which it did not intend to perform. *Id.* ¶¶ 157-60. In support of those allegations, Brewton cites the evidence she highlighted in her supplemental response to the motion for summary judgment. Doc. 71-1 at 6-9.

But, as discussed above, the evidence, viewed in the light most favorable to Brewton, shows that First Liberty assessed Brewton's home for diminished value, and if Brewton contests First Liberty's finding that there was no diminished value, her remedy is to contest First Liberty's failure to pay. The evidence, viewed in the light most favorable to Brewton, does not permit a reasonable jury to find that First Liberty implemented a "sham" assessment process for diminished value that amounts to no assessment at all. But the argument that First Liberty only performed a "sham" assessment is the basis of all of Brewton's requested amendments. *See generally* Docs. 71-1; 71-2. Accordingly, since the Court has found as a matter of law that First Liberty did not perform a "sham" assessment that amounts to no assessment at all, Brewton's requested amendments are futile. *See Hall*, 367 F.3d at 1263 (holding that the district court properly denied a motion to file an amended complaint that would have

added new claims that would have been subject to dismissal as a matter of law for the same reasons the district court granted summary judgment on the operative complaint).

**C.      Unfair Prejudice and Undue Delay**

In its order on a previous motion to amend, the Court found that justice required allowing Brewton's amendments, which enlarged the class by adding insureds who suffered other types of damage and restructured the claims to trace the Court's rulings in other diminished value cases.  *See generally* Doc. 48.  The Court found that, because "[d]iscovery only recently commenced and the parties have already taken the proposed amendment into account in their discovery schedule" and the amendment would expand the class but the issues would remain the same, First Liberty would not suffer undue prejudice and Brewton could not be found to have acted with undue delay.  *See generally* Doc. 48.  The Court further noted that there was no evidence that amendment would result in "prejudice, . . . advanced discovery, or interruption of the proceedings." *Id.* at 9.

The same cannot be said now.  To enable First Liberty to address the new allegations against it would require re-opening discovery and setting a new schedule for dispositive motions.  Brewton argues that "[t]he recent discovery verifies [her] belief that the [standard operating procedure] in fact was a sham" and therefore she has not delayed in moving to amend.  Doc. 71-1 at 10-11.  As discussed above, that recent discovery consisted of depositions by First Liberty's adjusters, claims unit manager, and diminished value point person, as well as First Liberty's inability to demonstrate that it ever paid out, set aside funds to pay out, or changed software to allow it to internally record paying out any diminished value claims.

But the record shows that Brewton should have been, and indeed was, aware of the facts underlying her new claims well before conducting supplemental discovery and moving to amend. On January 27, 2017, Brewton deposed Cook, the adjuster who assessed her property for diminished value, and Cook testified that he had evaluated Brewton's property pursuant to First Liberty's standard operating procedure. Doc. 53-14 at 129:11-130:4, 157:2-14. In a letter dated April 3, 2017, First Liberty's counsel informed Brewton's counsel that it intended to argue that First Liberty did assess for diminished value. Doc. 51-5 at 2. According to the letter, Brewton's claim file, which noted that diminished value had been assessed, "was included in First Liberty's very first document production in August 2016." *Id.* at 4. Long before moving to amend, Brewton also had access to the standard operating procedure, frequently asked questions, and a form letter that included the prepopulated statement that diminished value had been assessed for but not found, and she attached all of that evidence to her response to First Liberty's original motion for summary judgment. Docs. 53-6; 53-7; 53-10. And in her response to First Liberty's motion for summary judgment, which Brewton filed on May 8, 2017, Brewton cited all of that evidence in arguing that "[i]n reality, the [standard operating procedure] is a sham—a phony roadmap designed to allow First Liberty to say that it is performing its contractual obligations when it is not." Doc. 53 at 5; *see id.* at 5-11. As discussed above, the argument that the standard operating procedure is a sham is the basis of the claims Brewton seeks to add. It is thus clear that Brewton should have known and in fact did know facts supporting her new claims much earlier than when she filed her motion to amend.[6]

---

[6] The Court also notes that the Scheduling and Discovery Orders prepared by the parties required that "[a]ll motions seeking to amend the pleadings or to join parties or claims must be filed as soon as the

Accordingly, in the alternative to finding that the amendments are futile, the Court finds that the amendments would result in unfair prejudice and constitute undue delay. *See, e.g.*, *Tampa Bay Water v. HDR Eng'g, Inc.*, 731 F.3d 1171, 1186 (11th Cir. 2013) ("A district court may find undue delay when the movant knew of facts supporting the new claim long before the movant requested leave to amend, and amendment would further delay the proceedings." (citations omitted)).

### III. CONCLUSION

For the reasons discussed above, the Court **DECLINES to alter its previous order** granting summary judgment on Brewton's "failure to assess" claims (Doc. 60) and **DENIES** Brewton's motion to file a third amended class action complaint (Doc. 71).

### ORDER TO SHOW CAUSE

Finally, as a result of the Court's order dismissing Brewton's failure to assess claim, only her failure to pay diminished value claim remains. It seems certain that that claim is not sufficient to satisfy the jurisdictional threshold for diversity jurisdiction. Accordingly, the Plaintiff shall show cause no later than **September 25, 2018** why this case should not be dismissed for lack of subject matter jurisdiction.

**SO ORDERED**, this 4th day of September, 2018.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT

---

need becomes apparent." Docs. 35 at 7; 46 at 3. While these orders did not set a specific date as a deadline to amend the pleadings or add claims, it is clear, for the reasons discussed above, that the need should have become apparent much earlier than Brewton actually moved to amend, and the Scheduling and Discovery Orders should have further underlined to Brewton the requirement that she move to amend sooner than she did.